IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
January 9, 2019 Session

## ERNEST HOBBS v. RUSSELL L. LEONARD ET AL.

**Appeal from the Circuit Court for Coffee County**
**No. 43271      Vanessa Jackson, Judge**

_____

### No. M2018-00317-COA-R3-CV

_____

After a defendant in an earlier action settled the claims against him, the lawyer representing the plaintiffs in the earlier action notified a regulatory agency of the defendant's alleged conduct at issue in the earlier action. The defendant/current plaintiff filed a breach of contract action against the lawyer, asserting that the lawyer breached the terms of the settlement agreement by filing a complaint against him with the regulatory agency. The lawyer defended the action by claiming that the settlement agreement violated public policy and was unenforceable. The trial court held that the settlement agreement was not contrary to public policy and entered judgment for the plaintiff. The lawyer appealed, and we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed and Remanded**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which W. NEAL MCBRAYER, J., joined, and RICHARD H. DINKINS, J., filed a separate concurring opinion.

Donald N. Capparella, Nashville, Tennessee, for the appellant, Russell L. Leonard.

Brennan Maureen Wingerter, Knoxville, Tennessee, for the appellee, Ernest Hobbs.

### OPINION

#### I. FACTUAL AND PROCEDURAL BACKGROUND

Ernest Hobbs was the defendant in an earlier action filed in chancery court in which Russell L. Leonard was the attorney representing three individuals, Laura Houghtaling, Dustin Frazier, and Tiffany Chrisulis (now Frazier). The plaintiffs in the earlier action, Case No. 2014-CV-170, asserted that Mr. Hobbs had falsely represented

himself as a real estate agent and that his actions constituted fraudulent and deceptive trade practices. The parties settled Case No. 2014-CV-170 in December 2014 and signed a General Release. Mr. Leonard approved the release "as to form and substance" and signed his name as "Attorney for Plaintiff."

The parties identified Case No. 2014-CV-170 in the General Release and stated their desire "to settle, compromise and dispose of the above-described claims . . . ." The release continued, in pertinent part:

> By the execution of this Release, the PLAINTIFFS, for themselves and their family, . . . , agents, legal representatives . . . do hereby forever and fully remise, release, acquit and discharge the DEFENDANTS, their family, . . . , agents, legal representatives, . . . , sole proprietorships or entities affiliated with, related to, owned or controlled by them, (hereinafter referred to collectively as the RELEASED PARTIES) of and from any and all actions, causes of action, suits, debts, sums of money, accounts, covenants, contracts, agreements, arrangements, promises, obligations, warranties, trespasses, torts, injuries, losses, damages, claims, demands, and other relief of any nature whatsoever, whether known or unknown, whether absolute, fixed or contingent, whether in law, in equity or before administrative agencies or departments, that PLAINTIFFS ever had, now have or hereafter can, shall or may have, by reason of or arising out of any matter, cause or event alleged or which could have been alleged in the above-referenced action in the Chancery Court of Coffee County, Tennessee, Case #2014-CV-170, which will be dismissed on the merits with full prejudice and the Court costs, but not the discretionary costs, will be taxed to the PLAINTIFFS.

> In connection with the foregoing, it is expressly understood and agreed by PLAINTIFFS as follows:

> (a) That this is a full and final general release of all matters whatsoever and that this general release is intended to and does embrace not only all known and anticipated damages and injury but also all unknown and unanticipated damages and injury that may later develop or be discovered, including all effects and consequences thereof;

> (b) That this release will forever bar any action or claim whatsoever by PLAINTIFFS against the RELEASED PARTIES, which arose or which might arise in the future from the claims released herein, and that no lawsuit will ever be instituted nor will any claim of any nature ever be asserted

against any person or entity hereby released for any injury or damages, whether known or unknown, sustained or to be sustained, as a result of the foregoing claims;

(c) That PLAINTIFFS shall indemnify, defend, and hold harmless the RELEASED PARTIES from and against any loss, claim, demand, damage, suit, cost or expense of any nature whatsoever (including attorneys' fees) arising from or relating to the claims herein released if said claims are asserted or attempted to be asserted by, under, or through the PLAINTIFFS, . . . , agents, . . . , legal representatives, . . . , or entities affiliated with, related to, owned or controlled by [them]; [and]

(d) That PLAINTIFFS and [their] counsel shall not solicit, encourage, assist, or incite the initiation by any other person or entity of any claims or demands against the RELEASED PARTIES arising from or relating to any allegations contained in the above-referenced action from the beginning of the world to the date of the Release[.]

The following month, in January 2015, Mr. Leonard sent a letter to the Tennessee Real Estate Commission ("TREC" or "the Commission") in which he identified himself as an attorney representing Mr. and Mrs. Frazier and Ms. Houghtaling. Mr. Leonard wrote that "[t]hese people asked me to forward a formal complaint to you concerning a Mr. Ernie Hobbs operating as Penguin Properties and Tennessee Homes, LLC." Mr. Leonard continued:

To put it briefly and succinctly, Mr. Hobbs is buying properties from one party and selling to another party without a license, and in the process is reaping huge profits that are nothing short of unjust enrichment. We were previously involved in legal action with Mr. Hobbs from the standpoint of a detainer with regard to Mr. and Mrs. Frazier and on behalf of Ms. Houghtaling and the Fraziers in a contract action that is separate and apart from the detainer. I have attached the original complaint and copies of the leases and option contracts produced by Mr. Hobbs as well [as] other materials instructive of what he is doing.

The Commission opened an investigation into Mr. Hobbs' activities based on Mr. Leonard's letter. Mr. Hobbs eventually entered into a Consent Decree with TREC and paid a fine of $6,000 to avoid formal disciplinary proceedings.

Mr. Hobbs then turned around and sued Mr. Leonard, Ms. Houghtaling, and Mr. and Mrs. Frazier for breach of contract, intentional infliction of emotional distress, defamation, and interference with business relations. According to Mr. Hobbs, the claims Mr. Leonard made in his letter to the Commission were identical in substance to the claims that the plaintiffs in the earlier action (Case No. 2014-CV-170) asserted against him that were released in the General Release. Mr. and Mrs. Frazier answered the complaint and denied having any knowledge of the letter Mr. Leonard sent to TREC. Mr. Leonard moved to dismiss the complaint and/or for summary judgment, which the trial court denied. Ms. Houghtaling did not file an answer to the complaint, and Mr. Hobbs obtained a default judgment against her.

A trial was held on November 14, 2017, and the trial court entered a Final Order on January 31, 2018, finding that Mr. Leonard breached the General Release and awarding Mr. Hobbs damages in the amount of $6,000 and attorney's fees in the amount of $14,288.30. Mr. Leonard admitted at trial that his former clients, Ms. Houghtaling and the Fraziers, did not ask him to forward the January 2015 letter to the Commission and were unaware that he had done so. In its Final Order, the court found:

> Leonard's testimony concerning the letter sent to the Real Estate Commission is confusing and somewhat inconsistent. Leonard testified that he had actually composed the letter to the Tennessee Real Estate Commission in November 2014. He testified that, when he decided to file the complaint against Hobbs in January 2015, his secretary printed the letter, and he signed it without reviewing it. He later testified that he did make changes to the letter before mailing [it] in January 2015, which would indicate that he did in fact review it before mailing it. Leonard also testified that he filed the formal complaint with the Tennessee Real Estate Commission because he suspected that Hobbs was continuing to engage in alleged wrongful practices. However, Leonard did not offer any credible evidence to support his suspicion, and he did not cite to the Tennessee Real Estate Commission any wrongful conduct by Hobbs, other than the conduct alleged in the Complaint and Amended Complaint in Case No. 2014-CV-170.

The court then made the following conclusions of law in response to Mr. Leonard's argument that the General Release was against public policy:

> It is clear from the language of the General Release that neither Laura Houghtaling, Dustin Frazier, Tiffany Chrisulis Frazier nor their legal representative, Leonard, were to solicit, encourage, assist, or incite the initiation by any other person or entity of any claims or demands against Hobbs arising from or relating to any allegations contained in Case No. 2014-CV-170. The General Release would be meaningless if the legal

representative of the parties could solicit, encourage, assist or incite initiation by the Tennessee Real Estate Commission [of a claim] against Hobbs based upon the same allegations set forth in Case No. 2014-CV-170. Moreover, Leonard signed the Release agreeing to both the "form and substance" of the agreement.

As to [Leonard's] argument that enforcement of the General Release is against public policy, the case of *Baugh v. Novak*, 340 S.W.3d 372 (Tenn. 2011), sets forth the three criteria that the Court must consider when declining to enforce a contract on the basis of violation of public policy. First, the violation of public policy must be clearly established. Secondly, the violation of public policy must be inherent in the contract or its purpose taints it with illegality. Thirdly, a clear public detriment will probably occur as a result of the contract or the object of the contract tends to injure the public. The Court finds that a violation of public policy is not inherent in the General Release and its purpose does not taint it with illegality. The General Release contains the standard terms and conditions found in contracts that provide for the settlement of lawsuits and release of the parties from liability. . . .

. . . .

In conclusion, the Court finds that enforcement of the General Release is not against public policy, and the Defendants, Laura Houghtaling, Dustin Frazier, Tiffany Chrisulis Frazier and Russell L. Leonard are jointly and severally liable to Ernest Hobbs in the amount of $6,000.00. . . .

On appeal, Mr. Leonard argues that the trial court erred in failing to rule that the General Release violates public policy because it bars the reporting of illegal conduct to a state agency. He also argues that the court erred in awarding Mr. Hobbs damages in the amount he paid as a fine to the Commission and in awarding Mr. Hobbs his attorney's fees.

## II. Analysis

Appellate review of a trial court's factual findings is de novo upon the record, accompanied by a presumption of correctness, unless the evidence in the record preponderates to the contrary. TENN. R. APP. P. 13(d); *Forrest Constr. Co., LLC v. Laughlin*, 337 S.W.3d 211, 220 (Tenn. Ct. App. 2009). This means that an appellate court is "bound to leave a trial court's finding of fact undisturbed unless it determines that the aggregate weight of the evidence demonstrates that a finding of fact other than the one found by the trial court is more probably true." *Nashville Ford Tractor, Inc. v.*

- 5 -

*Great Am. Ins. Co.*, 194 S.W.3d 415, 425 (Tenn. Ct. App. 2005). Appellate courts review questions of law de novo and do not apply a presumption of correctness to a trial court's legal conclusions. *Id.* The issue whether a contract is unenforceable because it violates public policy is a question of law. *Baugh v. Novak*, 340 S.W.3d 372, 381 (Tenn. 2011) (citing *Mascari v. Raines*, 415 S.W.2d 874, 877 (Tenn. 1967); *Vintage Health Res., Inc. v. Guiangan*, 309 S.W.3d 448, 464 (Tenn. Ct. App. 2009)).

A. Public Policy Considerations

Mr. Leonard does not dispute that the General Release, by its terms, precluded him, as the legal representative of Ms. Houghtaling and the Fraziers in Case No. 2014-CV-170, from encouraging, assisting, or inciting an investigation by TREC into Mr. Hobbs' activities arising from or related to the allegations asserted in that action. Rather, Mr. Leonard asserts that the prohibition contained in the release violates public policy and is, therefore, void and unenforceable.

Our Supreme Court has stated that "'public policy is best served by freedom of contract,'" *Baugh*, 340 S.W.3d at 383 (quoting *Chazen v. Trailmobile, Inc.*, 384 S.W.2d 1, 3 (Tenn. 1964)), and that the right to contract is both a liberty and a property right, *id.* (citing *State ex rel. Astor v. Schlitz Brewing Co.*, 59 S.W. 1033, 1040 (Tenn. 1900)). This right is not absolute, however, and "must give way to the preservation of the public health, safety, morals, or general welfare." *Id.* (citing *State v. Greeson*, 124 S.W.2d 253, 256 (Tenn. 1939)). Courts will not enforce a contract that violates public policy. *Id.* A contract violates public policy in the following limited circumstances:

> (1) when the violation of public policy is clearly established, (2) when the violation is inherent in the contract itself, not collateral thereto, or when the contract's purpose taints it with illegality, and (3) when a clear public detriment will probably occur as a result of the contract or where the object of the contract tends to injure the public.

*Id.* at 383-84 (footnotes omitted); *see also Vintage Health Res., Inc.*, 309 S.W.3d at 464-65. The *Baugh* decision directs courts "to wield a scalpel rather than a sledgehammer" when invalidating provisions of a contract that violate public policy and to "interpret contracts in a way that upholds their validity" whenever possible. *Baugh*, 340 S.W.3d at 384 (citing *Carolina Spruce Co. v. Black Mountain Ry.*, 201 S.W. 154, 159 (Tenn. 1918)). The Court cautioned against finding a contract unenforceable for public policy reasons, however, when the party seeking to invalidate it has already received the benefit of the other party's performance. *Id.* (citing *Vintage Health Res.*, 309 S.W.3d at 465).

The Tennessee Real Estate Broker License Act of 1973 ("the Act") makes it unlawful for any person to act as a real estate broker without first obtaining a license as a broker. Tenn. Code Ann. § 62-13-301. The failure of a person to obtain a real estate

broker's license before acting as a broker commits a Class B misdemeanor. Tenn. Code Ann. § 62-13-110(a)(1); *see Bus. Brokerage Ctr. v. Dixon*, 874 S.W.2d 1, 3 (Tenn. 1994) (discussing various provisions of the Act). Mr. Leonard contends that the provision in the General Release that prohibits him from informing TREC of Mr. Hobbs' violations of real estate law violates public policy because the purpose of the Act is to safeguard the public's interest by ensuring that only those who meet the statutory requirements for licenses are able to obtain a license and that those who fail to comply are disciplined.

It is important to keep in mind that the plaintiffs in Case No. 2014-CV-170 settled their claims against Mr. Hobbs and that Mr. Hobbs was not found liable for violating any provision of the Act or engaging in any other wrongdoing. It is also important to note that the General Release is limited and only precludes Mr. Leonard and his former clients from reporting claims that were raised or could have been raised against Mr. Hobbs in the case that was settled, Case No. 2014-CV-170. The release does not preclude Mr. Leonard or his former clients from reporting any other conduct by Mr. Hobbs that they believe violates the Act. In his letter to the Commission, Mr. Leonard referenced activities Mr. Hobbs may have engaged in with people other than Mr. Leonard's former clients that may have been in violation of the Act. The parties' release does not preclude Mr. Leonard from reporting this other activity; it only precludes his reporting the activities that were, or could have been, the subject matter of the earlier action. As the trial court found, Mr. Leonard did not specify any wrongful conduct Mr. Hobbs may have engaged in other than that asserted in Case No. 2014-CV-170.

Applying the test set forth in *Baugh v. Novak* to determine if the General Release is contrary to public policy, we first ask whether the release contains a violation of public policy that is clearly established. *Baugh*, 340 S.W.3d at 383. The standard in Tennessee has long been that "[a] contract should not be declared void as against public policy except in cases free from doubt," when "a prejudice to the public interest . . . clearly appear[s]." *Evans v. Sheriden*, 186 S.W.2d 911, 914 (Tenn. Ct. App. 1944) (cited with approval by *Baugh*, 340 S.W.3d at 383 n.7); *see also Stansell v. Roach*, 246 S.W. 520, 522 (Tenn. 1923) (stating that court is only justified in declaring contract void on public policy grounds when prejudice to public interest is clearly apparent) (cited with approval by *Baugh*, 340 S.W.3d at 383 n.7); *White v. McMath & Johnston*, 156 S.W. 470, 471 (Tenn. 1913) (declaring that "[t]he power to declare contracts void as against public policy is said to be a delicate and undefined power, only to be exercised in cases settled by recognized precedents and when free from doubt") (cited with approval by *Baugh*, 340 S.W.3d at 383 n.7). Ms. Houghtaling and the Fraziers were the only ones affected by the settlement of Case No. 2014-CV-170. The General Release does not prohibit the reporting of any violations of the Act other than those asserted, or that could have been asserted in Case No. 2014-CV-170. Therefore, it does not prejudice the general public. We conclude that the General Release does not violate a clearly established public policy.

The second prong of the test enunciated in *Baugh v. Novak* requires us to determine whether a violation of public policy "is inherent in the contract itself" or whether "the contract's purpose taints it with illegality." *Baugh*, 340 S.W.3d at 383-84. "A contract will not be deemed to violate public policy unless it tends to harm the public good or conflict with Tennessee's constitution, laws or judicial decisions." *Vintage Health Res.*, 309 S.W.3d at 465 (citing *Spiegel v. Thomas, Mann & Smith, P.C.*, 811 S.W.2d 528, 530 (Tenn. 1991)); *see also Holt v. Holt*, 751 S.W.2d 426, 428 (Tenn. Ct. App. 1988). The purpose of the General Release was to settle a legal dispute between Mr. Hobbs, Ms. Houghtaling, and the Fraziers. Settling a legal dispute is certainly not illegal, and it does not conflict with Tennessee's constitution, laws, or judicial decisions. *See Swiger v. Nashville Union Stockyard Rest. Co., Inc.*, No. M2002-02971-WC-R3-CV, 2004 WL 123314, at \*2 (Tenn. Workers' Comp. Panel Jan. 27, 2004). Trial courts often encourage litigants to settle their disputes if at all possible, and no settlement of a dispute can be achieved if the plaintiffs or their attorney can breathe life back into the case in a different venue after the agreement is finalized, as Mr. Leonard did here.

This is not a case like *Freeman v. Thompson*, 600 S.W.2d 234, 234-36 (Tenn. Ct. App. 1979), where the purpose of the parties' agreement was to circumvent a Tennessee statute that prohibited the rebate of insurance commissions to an insured. Writing that "the Tennessee courts cannot be used as an instrument to enforce obligations alleged to arise out of a contract or transaction which is illegal," the *Freeman* court concluded that the contract violated public policy and refused to enforce it as a result. *Freeman*, 600 S.W.2d at 236-37. Contrary to Mr. Leonard's suggestion, the purpose of the General Release was not to prevent *any* suspected violations of the Act from being reported to the Commission; the purpose was merely to settle Case No. 2014-CV-170, and as part of that settlement, the parties agreed not to revive the alleged violations that were at issue in that case in any venue. We conclude that the General Release contains no inherent violation of public policy and that its purpose is not tainted with illegality.

We now turn to the third prong of the test to determine whether the General Release violates public policy: whether a "clear public detriment" is likely to occur if the contract is enforced or whether the contract's objective injures the public. *Baugh*, 340 S.W.3d at 384. As discussed above, the General Release settled a private dispute between Mr. Hobbs and Mr. Leonard's clients in Case No. 2014-CV-170, and the only alleged violation(s) of the Act by Mr. Hobbs that Mr. Leonard and his clients were precluded from reporting to the Commission were those at issue in that case. Mr. Leonard fails to show how the release's objective injures the general public or how enforcement of the General Release constitutes a clear public detriment. *See generally Lazenby v. Universal Underwriters Ins. Co.*, 383 S.W.2d 1, 4-5 (Tenn. 1964) (discussing effects on general public of requiring insurance company to cover insured's liability for punitive damages). We conclude that enforcement of the General Release is not likely to

lead to a clear public detriment and that the objective of the release, which is the settlement of the parties' dispute, is not injurious to the public.[1]

## B. Damages

Mr. Leonard next argues that the trial court erred in requiring him to reimburse Mr. Hobbs for the $6,000 fine Mr. Hobbs paid TREC in exchange for avoiding formal disciplinary proceedings. Mr. Leonard relies on the terms of the Consent Decree between Mr. Hobbs and TREC to support this argument. The parties had a running disagreement throughout the proceedings in the trial court about the relevance of the Consent Decree to Mr. Hobbs' breach of contract claim. Mr. Hobbs produced the Consent Decree to Mr. Leonard during discovery, but he objected to its relevance. Then, when Mr. Leonard relied on the terms of the Consent Decree to support his motion to dismiss and/or for summary judgment, Mr. Hobbs moved to strike the Consent Decree from the record. As part of its order denying Mr. Leonard's motion to dismiss and/or for summary judgment, the trial court granted Mr. Hobbs' motion to strike the Consent Decree from the record.

During the trial of this case, Mr. Leonard introduced the Consent Decree into evidence as an exhibit over Mr. Hobbs' objection. The trial court heard the parties' arguments regarding whether or not the Consent Decree should be admitted based on its relevance to Mr. Hobbs' breach of contract claim and stated: "[I]n the event that I determine that the general release does not violate public policy, then the consent order and the questions concerning it will be stricken from the record." Because the trial court ultimately concluded that the General Release does not violate public policy, the Consent Decree is stricken from the record, and Mr. Leonard is unable to rely on it for his argument on appeal.

The General Release set forth the terms of the parties' settlement of the claims at issue in Case No. 2014-CV-170. "A settlement agreement made during the course of litigation is a contract between the parties, and as such, contract law governs disputes concerning the formation, construction, and enforceability of the settlement agreement." *Waddle v. Elrod*, 367 S.W.3d 217, 222 (Tenn. 2012). A plaintiff is entitled to recover damages for a breach of contract if he or she can prove "the existence of a valid and enforceable contract, a deficiency in the performance amounting to a breach, and damages caused by the breach." *Fed. Ins. Co. v. Winters*, 354 S.W.3d 287, 291 (Tenn. 2011).

---

[1]Even if we were tempted to rule that the General Release is unenforceable on public policy grounds, which we are not, we would hesitate to invalidate it because Mr. Leonard has already benefited from Mr. Hobbs' agreement to settle Mr. Leonard's clients' claims. *See Baugh*, 340 S.W.3d at 384 (cautioning courts against invalidating contract on public policy grounds where party seeking invalidation has already benefited from contract).

We have already concluded that the General Release is an enforceable agreement, and Mr. Leonard admits to informing TREC about the allegations against Mr. Hobbs stemming from Case No. 2014-CV-170, which constituted a breach of the agreement. On the issue of damages, Mr. Leonard argues he was not the cause of TREC's decision to assess a $6,000 fine against Mr. Hobbs. Although Mr. Leonard acknowledges that he violated the terms of the release, Mr. Leonard contends that "Mr. Hobbs' repeated violations of Tennessee real estate law were both the actual and proximate cause of the fine he received from the Tennessee Real Estate Commission." Mr. Leonard testified at trial that he filed a complaint with TREC based on his suspicion that Mr. Hobbs was continuing to engage in wrongful conduct, separate and apart from that at issue in Case No. 2014-CV-170, that violated the Act. However, the trial court found that Mr. Leonard failed to provide "any credible evidence to support his suspicion, and he did not cite to the Tennessee Real Estate Commission any wrongful conduct by Hobbs, other than the conduct alleged in the Complaint and Amended Complaint in Case No. 2014-CV-170." Because the Consent Order has been stricken from the record, we are unable to consider that document on appeal.[2] A review of the transcript leads us to conclude that the preponderance of the evidence is not contrary to the trial court's finding that Mr. Leonard failed to introduce proof at trial supporting his suspicions of Mr. Hobbs' other violations of the Act.[3]

Mr. Hobbs introduced into evidence copies of the checks he wrote to TREC that total $6,000, and he testified that he was required to pay this sum to avoid formal disciplinary proceedings. Other than the Consent Order, which has been stricken from the record, Mr. Leonard presented no evidence that TREC would have assessed Mr. Hobbs a fine in the amount of $6,000 absent Mr. Leonard's letter informing it of Mr. Hobbs' allegedly unlawful activities. We conclude, therefore, that Mr. Leonard's breach of the General Release caused Mr. Hobbs to be fined $6,000 by TREC.

The General Release provided that Mr. Hobbs would be indemnified for all costs and expenses, including attorney's fees, if Mr. Leonard or his former clients breached the agreement. Based on our conclusion that Mr. Leonard breached the General Release, we conclude that Mr. Leonard is liable to Mr. Hobbs for both the $6,000 fine that the Commission assessed as well as for the attorney's fees Mr. Hobbs incurred at trial and on appeal. We affirm the trial court's award of attorney's fees in the amount of $14,288.30 incurred at trial and remand for the trial court to determine the reasonable attorney's fees Mr. Hobbs incurred defending Mr. Leonard's appeal.

---

[2]Mr. Leonard relies on language in the Consent Decree to support his argument that Mr. Hobbs admitted to misconduct in connection with two other real estate transactions. Because the Consent Decree has been stricken from the record, however, Mr. Leonard's reliance on the decree is unavailing.

[3]Mr. Leonard admitted at trial that he had only suspicions, but no proof, of any other violations of the Act by Mr. Hobbs, and he admitted that he did not provide any evidence to the Commission of any violations of the Act by Mr. Hobbs other than those asserted in Case No. 2014-CV-170.

## III. CONCLUSION

We affirm the trial court's judgment in all respects and remand for a determination of the reasonable attorney's fees Mr. Hobbs incurred on appeal. Costs of this appeal shall be assessed against the appellant, Russell L. Leonard, for which execution may issue if necessary.

_____

ANDY D. BENNETT, JUDGE